# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 6783 | **DATE** | 6/8/2000 |
| **CASE TITLE** | Susan Shott vs. Rush-Presbyterian Hospital, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 6/22/00 at 9:30 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Rush's motion for a new trial on the disability claim is granted. Defendant's Post-Trial Motions are otherwise granted in part and denied in part [128]. Plaintiff's motion to amend the judgment [129-1] is denied as moot. Plaintiff's Fee Petition [129-2] is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | JUN 09 2000 |
| | Copy to judge/magistrate judge. | |
| RJ | courtroom deputy's initials | |
| | | Date/time received in central Clerk's Office |

Document Number

150

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN SHOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 94 C 6783 |
| | ) | |
| RUSH-PRESBYTERIAN, et al. | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendants. | ) | |

DOCKETED

JUN 0 9 2000

## MEMORANDUM OPINION AND ORDER

Defendant has filed post-trial motions seeking judgment as a matter of law on plaintiff's

ADA claim or, in the alternative, disallowance of the jury's punitive damage award, a new trial

under Rule 59 or a reduction of plaintiff's compensatory and punitive damages to $300,000.

The court concludes that defendant is not entitled to judgment as a matter of law, since plaintiff

submitted some evidence to support a jury verdict in her favor. However, for reasons that will be

explained below, the evidence in support of plaintiff's failure to accommodate claim (the primary

basis on which plaintiff's disability claim was argued) was razor-thin at best, and the manner in

which this case was presented to the jury created a serious danger that the jury may have been

unable to separate the evidence supportive of the disability claim from evidence that should not

have been considered on that claim. Because plaintiff's religious discrimination claim arose long

before she made any effort to engage in a good faith interactive process with respect to her

disability, and because much of the evidence that plaintiff contended supported her failure to

accommodate claim involved conduct of which she complained before she ever notified

1



defendant that she needed an accommodation, the trial of the two claims together (at least without jury instructions that would have focused the jury's attention on the issue of when defendant was notified of plaintiff's need for the various accommodations she desired) was fundamentally unfair to defendant. Accordingly, Rush's motion for a new trial on plaintiff's ADA claim is granted.

There is no dispute that plaintiff, a statistician and faculty member at Rush, is severely disabled by rheumatoid arthritis. While plaintiff's Third Amended Complaint charges that Rush discriminated against plaintiff on the basis of her disability, this case was not presented as a disability discrimination claim as much as a failure to accommodate claim.[1]

Plaintiff's ADA claim has a number of elements. First, she contends that Dr. Preisler refused to accommodate her need to come in early and leave early by scheduling meetings late in the day, complaining about her hours and sending her various notices (which were addressed and sent to all Cancer Institute employees) indicating that all employees must work normal working

---

[1]Against Rush's contention that plaintiff did not bring her disability to Rush's attention until May 1994, plaintiff contended that her disability was obvious long before that because she frequently wore visible bandages and braces. But this circumstance cuts against the theory that Dr. Preisler discriminated against plaintiff *because* she had arthritis. In this visibly-disabled condition, plaintiff was asked by Dr. Harvey Preisler to come to work for him in the Rush Cancer Institute, of which he was the director. She began at the Cancer Institute on January 1, 1993. Again, with the disability plaintiff argued was obvious to all, she worked contentedly under Dr. Preisler for 15 months. She kept atypical hours, coming in early and leaving early in order to avoid having to sit in rush hour traffic, which caused her pain and stiffness, with no complaint from Dr. Preisler. She testified that Dr. Preisler never objected if personal matters caused her to miss a meeting. She testified that they got along extremely well, with Dr. Preisler frequently praising her work to others. If it is believed that plaintiff's disabled condition was obvious, as she testified, and if it is believed, as she testified, that until March 1994, she enjoyed an excellent relationship with Dr. Preisler who accommodated all her needs, it is extremely unlikely that Dr. Preisler became hostile to her simply because of her disability.

2

hours. Second, plaintiff contends that Dr. Preisler refused to accommodate her disability when, beginning in the spring of 1994, he began increasing her workload by (1) refusing to allow her to hire a replacement for her data manager, who left Rush in or around March 1994, and whose work included large amounts of clerical typing which was physically burdensome for plaintiff to do herself; (2) demanding that she provide him with the computer output from her statistical analyses, rather than the summary reports she had previously provided, which required her to do large amounts of editing which in turn required a great deal of clerical typing; (3) refusing to reduce the number of variables he required her to analyze, given that the large number of variables increased her typing load. In essence, plaintiff claims that her rheumatoid arthritis made it painful and difficult for her to do large amounts of clerical typing and that Rush failed to accommodate her disability both by making unreasonable typing demands on her and by making no effort to help her limit her computer work.[2] Third, plaintiff claims that Rush discriminated against her on account of her disability when, in July 1995, it removed her from her position in the Cancer Institute and reassigned her to the Department of Neurosurgery, with a cut in pay. Plaintiff claimed that her removal from the Cancer Institute was not only disability discrimination but retaliation for her complaints about religious and disability discrimination. The jury rejected the retaliation claim.

The court's discomfort with the jury verdict in this case stems from its analysis of the chronology of plaintiff's complaints. Essentially, it appears that with the exception of the claim

---

[2]There is no question that plaintiff was able to type. Indeed, the record is full of lengthy letters she typed to Dr. Preisler during periods of time when the evidence indicated that typing was most difficult and potentially dangerous for her. She maintained that it was large amounts of repetitive typing that aggravated her condition.

based on plaintiff's removal from the Cancer Institute, the conduct of Dr. Preisler of which plaintiff complains began long before plaintiff advised Dr. Preisler of her disability or her need for accommodation, raising a substantial question of the causal relationship between plaintiff's disability and the conduct of which she complains. Further, a substantial portion of plaintiff's claim as to Rush's failure to accommodate her–her complaint about Dr. Preisler's refusal to accommodate her need for special working hours–was not supported by the evidence. Moreover, insofar as plaintiff is complaining that Rush failed to accommodate her disability once she brought it to Rush's attention, there is little if any evidence of the good faith interactive process the law requires. *See generally Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

According to plaintiff, up until March 23, 1994 she had an excellent relationship with Dr. Harvey Preisler, the Director of the Rush Cancer Institute, for whom she worked. Plaintiff testified that her troubles with Dr. Preisler began suddenly on March 23, 1994, when she informed him that she was an Orthodox Jew. On this date, plaintiff asked him to change the time he had scheduled for her to give a presentation as it conflicted with her religious obligations and advised him that she would be absent for Passover. Dr. Shott testified that at this point, Dr. Preisler became very hostile and started dumping "a huge load of computer work" on her. In addition, he started requiring her to provide him with large quantities of edited computer output that imposed a huge burden on her. Citing budgetary problems, he also countermanded his own directive of March 21 that she could replace her data manager (who apparently took a great deal of this burden from her) and told her, shortly after March 23, that she could not hire a replacement.

On May 25, 1994, Dr. Shott wrote to Dr. Preisler complaining that Dr. Preisler's assistant had told her she was required to attend a meeting which conflicted with her religious observance and further complaining that she was being required to obtain permission long in advance to take any personal time off. DX 9.[3] Dr. Preisler responded in an angry note, asserting that Dr. Shott, not being a physician, had many fewer demands on her time than the other people who had to be assembled for meetings and she should be available for meetings from 8:00 to 5:00 on weekdays. He stated, "I am aware of the fact that you prefer to come to work earlier and leave earlier. This may continue as long as it does not impair your ability to interact with your colleagues in the Cancer Institute." He also told her that she should give him a month's notice of any days on which she expected to be absent. PX 15. On May 26, Dr. Shott responded with a list of 15 dates from May 1994 through August 1995 on which she expected to be absent for religious reasons.

The first notification to Dr. Preisler that Dr. Shott's hours were related to her disability came on May 27, 1994. On that date, Dr. Shott provided Dr. Preisler with a letter from her physician informing him that Dr. Shott suffered from rheumatoid arthritis and "generally works from 5:30 to 2:30 pm in order to avoid having to be in a seated position for a long period of time because of rush hour driving and becoming quite stiff from this." PX 17. It continues, politely if somewhat ambiguously, "I believe this should not interfere with her function certainly and from what I understand arrangements are often made in terms of meetings that might be held later in

---

[3]During this period of time at the Cancer Institute, there were numerous occasions when employees were restricted in the time off they were allowed to take. There is no evidence that Dr. Shott was treated differently from other employees. Rather, Dr. Shott's complaint is that she needed to be treated differently because of her religious obligations and/or disability, and that because she was a faculty member, she was entitled to more freedom to set her own schedule than were other employees.

the day." *Id.* Plaintiff relies on this letter as informing Dr. Preisler that it was medically necessary for her to keep early hours, but in fact it does not do so. At most it informs Dr. Preisler that it is uncomfortable for Dr. Shott to sit in rush hour traffic and that she prefers to avoid the discomfort by coming in and leaving early. It falls far short of informing him that she must invariably leave every day by 2:30. Indeed, by Dr. Shott's own testimony, her disability could be accommodated by any schedule that allowed her to bypass rush hour traffic. She testified that on numerous occasions such as when she had surgery or other medical procedures necessitated by her arthritis, she came to work late and left after the rush hour. There was no showing that Dr. Shott could not, on the occasions when a late meeting was scheduled (and the record suggests that there were at most a handful of such meetings), come in later that day and stay until after the rush hour or stay late to attend the meeting and come in later the next morning. At one point, Dr. Preisler explicitly suggested she do this. For this reason, it is not clear that plaintiff could not be accommodated despite late meetings by taking Dr. Preisler's suggestion that she come in late and leave late on those days or by staying late for the meeting and coming in after the rush hour on the next morning. In any event, Dr. Preisler responded to the May 27 letter in a letter stating, "I had no idea that there was a medical reason for your hours. We will make every attempt to schedule meetings to assist you in keeping those hours." DX 20.

There is no evidence of further mention of Dr. Shott's disability by any party until July 22, but on June 10, Dr. Shott filed a charge of religious and disability discrimination against Dr. Preisler with the Chicago Commission on Human Relations. Between the May correspondence and the July 22 letter, Dr. Shott and Dr. Preisler engaged in continuous correspondence relating to the Jewish holidays, much of it in a hostile tone. By this time, it is

6

clear that the parties' relationship had significantly deteriorated, but as of this point, the only accommodation that had been discussed related to Dr. Shott's hours.

Dr. Shott wrote to Dr. Preisler on July 22. The letter, which is belligerent in tone, deals primarily with the subject of whether Dr. Preisler will authorize Dr. Shott to hire a replacement for a data entry clerk who is leaving. It does not appear that there was prior communication between these parties on this subject, but Dr. Shott threatens that if Dr. Preisler fails to replace the data clerk, the biostatistical unit will be unable to meet his deadlines. Dr. Shott takes Dr. Preisler to task for requiring her to do his "secretarial work" (by which she appears to mean data entry). Finally, on the second page of the letter, she states, "In addition, repetitive computer work such as data entry invariably causes severe arthritis flare-ups in my hands and in the tendons of my wrist. These flare-ups cause such acute pain and stiffness that it is difficult to sleep and use of my hands is extremely limited for 36-48 hours, even with complete rest from computer use. Without such rest, the flare-up continues without abating." PX 20. This letter is the first occasion on which Dr. Shott informed Dr. Preisler that her computer work aggravated her disability. She suggests no accommodation, other than the replacement of the data entry clerk. Dr. Preisler's assistant wrote back to Dr. Shott on July 27, stating that Dr. Preisler would replace the data entry clerk and wished to start the hiring process. DX 28.

Dr. Shott testified that Dr. Preisler's attitude was unaccommodating. She testified that in an argument with her at a meeting, he said that if he decided she should type for him, she would have to type for him. She asked him at a meeting around September 13, 1994, to reduce the number of variables in the statistical analyses he requested, and according to Dr. Shott, he

7

refused.[4]

The hostile correspondence between Dr. Preisler and Dr. Shott continued over the ensuing months, dealing with a range of subjects including but not limited to Dr. Shott's absences for the Jewish holidays and the conflicting demands on Dr. Shott's time, but not including any mention of Dr. Shott's disability or her need for an accommodation. In this period, specifically, November 14, 1994, Dr. Shott filed this lawsuit.

On December 7, 1994, Dr. Preisler sent a memo to Rush Cancer Institute employees informing them that due to a February 1, 1995 grant deadline, no vacation time or time off would be approved for the period January 3, 1995 through February 1, 1995, and that previously-approved time-off requests would have to be reapproved. Further the memo indicated that employees should be prepared, during this time period, to work late and on weekends. Dr. Preisler's memo provoked a letter from Dr. Shott in which she expressed concern about Dr. Preisler's letter and reminded him that because she was an Orthodox Jew, she could not work after 2:00 on Fridays and could not work on Saturdays. She also referenced her disability:

> I am physically disabled by rheumatoid arthritis. If I work during late afternoon hours, I have a long rush hour drive home. The resulting prolonged immobilization invariably causes severe pain and stiffness, thereby aggravating my disability. Public transportation is not an option for me because it carries a high risk of injury. I am disabled enough to

---

[4] It was never made clear to the court what these variables were or what impact, if any, it would have had on Dr. Preisler's research if the number of variables had been reduced. Dr. Shott was of the opinion that many of these variables were unnecessary, but it was not clear that she had the expertise to provide a definitive opinion on this question. Dr. Shott's opinion that the variables were unnecessary may have been enough, in the absence of any contradictory evidence, to meet her burden of showing that reducing the number of variables would have been a reasonable accommodation, but the evidence on this point was, to say the least, unsatisfying, since no foundation for her conclusion was provided. There was, however, evidence that Dr. Shott's successor worked with fewer variables.

make it quite difficult to avoid falling while riding a bus or train. Last summer, I took a very bad fall while riding a train and injured both my left knee and my neck. My physician, Dr. Jules Shapiro, has asked you to accommodate my early hours for medical reasons.

During the work week, I normally arrive at my office between 4:00 and 4:30 am. You can verify this by calling Rush Security (x25678), as I always call them when I arrive to let them know that I am entering Kidston and setting off the Kidston alarm. If possible, I leave my office at 2:30 p.m., although I sometimes have to stay later to finish urgent statistical work. In addition, I usually work at my office on Sundays. Please let me know whether you consider these work hours sufficient for me to do the statistical work needed to meet the February 1, 1995 project grant deadline.

Dr. Preisler responded:

As you know, there is no question regarding your working at times or on days which will interfere with the practice of your religion. This has been established in the past. The memo which you received was a generic one and you should have recognized that aspect of the memo did not apply to you.

On the other hand, you have been aware from the time that I gave you permission to work unusual hours that there were going to be times when you would have to alter these hours. This has not changed either. I will continue to attempt to schedule meetings at times which permit you to work your unusual hours. However, since some meetings will involve many individuals, including those who have clinical responsibilities, there may be meetings which will occur late in the afternoon. I suggest that you simply stay later in the day and leave the institution after rush hour is over. Needless to say, you may come in later to work on those days or, if a late meeting is scheduled on the same day, then you may come in later the next day.

DX 58.

More vituperative correspondence followed, such as DX 65 from Dr. Shott, and complaints by Dr. Preisler and his wife, Dr. Raza, about the quality and timeliness of Dr. Shott's work. *See, e.g.,* PX 37. On December 15, 1994, Dr. Shott wrote to Dr. Preisler, responding to his various criticisms and providing explanations for various problems he had complained about. At the end, Dr. Shott stated, "I have extremely poor hand function because of arthritis, and this slows me down. Doing the data manager's job involves a huge amount of computer work, and

this has caused sever hand and wrist pain, hand stiffness, and further loss of hand function, slowing me down even more." PX 38.

On December 23, 1994, Dr. Shott wrote to Dr. Preisler describing the results of various statistical analyses she had performed and critiquing the manner in which the data had been provided to her. In a "P.S." at the conclusion of the letter, Dr. Shott again brought up her disability: "I can no longer use my right hand at all to work on the computer because of severe pain, stiffness, loss of function and paresthesia, which has resulted from excessive computer work with a very arthritic hand. (My left hand is still usable but has the same problems.) This will obviously increase the time needed to complete computer work. It is equally obvious that there is absolutely nothing I can do about this." PX 40. Dr. Shott testified at trial that Dr. Preisler responded to this letter by "dumping" more computer work on her. The additional work was not quantified by Dr. Shott. Rush introduced no evidence indicating whether it agreed or disagreed that Dr. Shott's workload increased at this time.

On January 10, 1995, Dr. Shott was advised by her physician, Dr. Shapiro, that in preparation for carpal tunnel surgery scheduled for January 20 on her right wrist, she was restricted to a maximum of 2 hours a day on the computer, and following surgery, she should not type at all with the right hand for 6 weeks and then for a maximum of 2-4 hours a day. It is undisputed that Dr. Shott failed to inform Dr. Preisler or anyone else at Rush of these restrictions and repeatedly violated them. The restrictions were first brought to Rush's attention when Dr. Shott's lawyer sent them to Rush's lawyer on February 8 (PX 45); they were also raised at a pretrial conference with Judge Williams at about this time, as a complaint that Dr. Preisler was requiring Dr. Shott to do computer work in violation of her surgeon's restrictions. Dr. Preisler,

in a letter of February 22 (PX 49), suggested that Dr. Shott rely on her data input operators to help her limit her own computer use; Dr. Shott responded that she had been too busy to train the data operators to do this work. PX 50, p.3. She criticized Dr. Preisler for failing, when she had earlier requested that he help her prioritize her work (which it appears that he did), to indicate what priority she should give to training the data entry clerks, for failing to authorize the hiring of a data manager and for requesting of her too much "repetitive statistical data." Dr. Shott rejected Dr. Preisler's suggestion that they meet to discuss the problem with her keyboarding, saying that the matter was in litigation and he had previously been abusive to her. She concluded:

> If you wish further information, please write to me. If you need verification of the severity of my rheumatoid arthritis, you may contact my orthopedic surgeon, Dr. Jules Shapiro (x26071) or my spine surgeon, Dr. Ronald Moskovich (212-598-6622). Please bear in mind, however, that I am continuing to suffer physical pain and injury while you further delay accommodation of my physical disabilities. I have had almost complete relief of arthritis pain in my right hand since surgery because I have not been using this hand at all for computer work. In addition, the surgery and the break from computer work have almost completely resolved the carpal tunnel syndrome and flexor tensynovitis symptoms in this hand. However, all of my computer work will be shifted to my right hand on March 3, 1995, since I will have surgery on my left hand that day. If you do not permit me to restrict my computer work as my surgeon has recommended, I will have a chronic arthritis flare in my right hand and a signficantly increased risk of recurrence of carpal tunnel syndrome.

PX 50.

In late January 1995, Dr. Shott requested Freedom of Information Act records concerning Dr. Preisler from the State of Ohio, where Dr. Preisler had previously worked. In February, she anonymously distributed to various persons in and around Chicago and the suburbs her federal complaint, an article from a Jewish newspaper reporting on her complaints that Dr. Preisler was anti-Semitic, her various filings with the Chicago Commission on Human Relations and

derogatory information about Dr. Preisler's performance in his previous position obtained through her Ohio Freedom of Information Act request. In mid-February, Dr. Preisler learned of the distribution of this material through a professional colleague, the president of Lake Forest Hospital, who had received the packet of materials. DX 68.

By this time, the parties' correspondence was as likely litigation posturing as any kind of serious attempt at accommodation; at least, the parties' correspondence is all about the litigation. On February 22, Dr. Preisler wrote to Dr. Shott stating that his attorney had told him that she had complained to Judge Williams that he was forcing her to do computer work in violation of her surgeon's restrictions. He suggested that they meet, stating, "I need to get a better understanding of the amount of keyboarding you are currently doing and why you are doing it. Since you have two data input operators, it ought to be possible to hold your own computer keyboard work down." PX 49.

Dr. Shott wrote back on February 23, stating that Judge Williams told Rush's lawyers that Dr. Preisler should write her a letter stating that he would permit her to follow her surgeon's "recommendation that I restrict my computer work to no more than 2-4 hours a day." PX 50. According to Dr. Shott, Rush's lawyer had suggested that she take a medical leave if she could not get the work done. Dr. Shott stated that she would not take a medical leave since her condition was permanent and needed an accommodation, specifically, "early working hours and restriction of computer work." Dr. Shott reviewed all her correspondence with Dr. Preisler regarding her difficulty with the amount of computer work he gave her, specifically, letters of July 22, 1994, December 15, 1994, December 23, 1994 and January 24, 1995. She blamed Dr. Preisler for the problems she was experiencing with carpal tunnel syndrome and flexor

tenosynovitis, laid out her refutation of his suggested accommodations (such as training the data clerks to assist her) and accused him of lying when he cited budgetary problems as his reason for not replacing her data manager.

On March 1, 1995, Dr. Shott wrote Dr. Preisler a letter requesting direction on certain statistical tasks. She concluded, "I still have not received anything in writing from you that gives me permission to follow my surgeon's orders that I restrict my computer work to 2-4 hours a day. On the contrary: Our meeting yesterday gives me and my attorney good reason to believe that you will attempt to fire me if I do not continue to work at the computer 6-10 hours a day, 6 days a week, as I am presently doing. This is in violation of my surgeon's orders, it is causing me severe pain, and it is making my physical disabilities worse." PX 51.

Dr. Shott and Dr. Preisler, together with certain other individuals, met on March 20. Dr. Shott memorialized this meeting in a March 21 letter. In this letter, Dr. Shott stated, "You are continuing to require me to follow my surgeon's orders to restrict my computer work to no more than 2-4 hours a day." PX 56.

On April 7, 1995, Dr. Stuart Levin, Chairman of the Department of Internal Medicine, informed Dr. Shott that Rush was requiring her to take a medical leave for the reason, among others, that "[i]n a meeting last month with Dr. Preisler, you told him that with your physician's restriction, and given the current support staffing assigned to you, you are able to complete only approximately a third of the workload of statistical analysis that the Institute has been generating for you to do." PX 57. He stated that while she was on medical leave, if a funded biostatistics position became available that she could perform given her medical condition, Rush "would cooperate in putting you in touch with the appropriate department chairperson so that you may

13

apply for that job." Dr. Levin asked Dr. Shott to meet with him "to discuss these matters."

In early April, Dr. Shott's physician reported that her hands were doing extremely well post-operatively and she might be able to increase her computer work beyond 2 hours a day. DX 76. However, on April 20, Dr. Shott reported to Dr. Preisler that her attempt to increase her computer use to more than 2 hours a day had caused a serious recurrence of symptoms and she was accordingly cutting back to 2 hours. DX 82.

On or about April 21, Rush interviewed Dr. Li Ming Dong, the individual who would eventually be hired to replace Dr. Shott. *See* PX 59.

On May 18, Dr. Shott was absent from work for spine surgery. PX 62.

On May 24, Dr. Li Ming Dong was hired to replace Dr. Shott. PX 63.

On June 8, one of Dr. Shott's physicians advised Dr. Levin that Dr. Shott could now type for "four (4) hours per day and sometimes for longer periods." PX 69.

On July 5, Dr. Shott advised Dr. Preisler that she had asked Joanne Patterson to order her a different type of keyboard to cause less impact stress on her hands. PX 70.

On July 7, Dr. Shott was informed by Dr. Levin that she was being transferred to "a new biostatistics position in the Department of Neurosurgery." PX 71. Dr. Levin cited Dr. Shott's failure to meet with him, as he had requested in a letter to her of April 7; the fact that while her surgeon had stated that she could type for four hours a day, she continued to complain that this amount of typing caused her pain and her other physician had advised that there was a substantial risk of recurrence of her carpal tunnel syndrome; that four hours a day of keyboarding was in any event insufficient to do the job; that her conduct in distributing derogatory materials about Dr. Preisler to his professional peers outside of Rush was unacceptable; and that conflicts that had

developed between Dr. Shott and Dr. Preisler over methodology deprived him of the support to which he was entitled. As a result of her transfer, Dr. Shott lost 22% of her $62,000 salary; Rush's position was that this was because she lost her supervisory responsibilities, a contention Dr. Shott disputed.

While the court believes that there was possibly enough evidence to support a jury verdict in Dr. Shott's favor on her disability claim, the evidence was minimal and was so intermixed with the religious discrimination claim which the jury rejected as to leave open a substantial possibility that the jury did not hold Dr. Shott to her burden of showing, for instance, that she made efforts to engage in a good faith interactive process. The first notification Dr. Shott gave Dr. Preisler that she required any sort of accommodation was on May 27, 1994, and the accommodation she requested had only to do with her hours. If Dr. Preisler failed to accommodate Dr. Shott's hours, by holding late meetings, it is clear that he did so rarely; the record reveals at best proof of a handful of late-afternoon meetings. Moreover, there was absolutely no evidence that Dr. Shott's disability could not be equally accommodated by her working later hours than usual, rather than earlier hours than usual, so there is no way on this record that the verdict can be justified based on Rush's failure to accommodate Dr. Shott's need to work unusual hours. *See Rehling v. City of Chicago,* 207 F.3d 1009, 1014 (7th Cir. 2000) (employer obligated to provide qualified individual with a reasonable accommodation, not the accommodation she would prefer).

Dr. Shott filed her first complaint that Dr. Preisler discriminated against her on the basis of her disability on June 10, 1994, just two weeks after this May 27 notification. At the time she filed this charge she had, as far as this record reveals, absolutely no disability claim. She had not

been refused accommodations, she had suffered no adverse action on account of her disability and there had been *no* good faith interactive process related to her disability, other than the communication about her need for modified hours, which had been substantially if not totally accommodated. But importantly, whether because of Dr. Preisler's bias against Dr. Shott because of her religion (an explanation rejected by the jury) or because of Dr. Shott's constant complaints to Dr. Preisler, Dr. Levin and outside agencies about Dr. Preisler's refusal to honor her religious commitments, the relationship between the parties became increasingly hostile. It is easy to understand, as a matter of normal human dynamics, why Dr. Shott and Dr. Preisler could not talk constructively about accommodations; they were, if Dr. Shott's testimony is believed, essentially at war over the matter of her religion. Nevertheless, the parties' hostility cannot excuse Dr. Shott from meeting her burden of proving that she pursued a good faith interactive process to try to get the accommodations she required. The evidence that she did so is extremely weak.

One accommodation that Dr. Shott argued would have made it possible for her to do her job was the replacement of her data manager. But the decision of Dr. Preisler in or around March 1994 not to replace her data manager was, from Dr. Shott's point of view at least, due to religious discrimination, and it preceded by a substantial period of time any attempt on her part to raise it with Rush as an accommodation issue. Indeed, in her June 1994 charge against Rush and Dr. Preisler with the Chicago Commission on Human Relations, she claimed that the decision not to replace the data manager was due to religious discrimination. DX 22. The only failure to accommodate she complained of at this point in time was Dr. Preisler's refusal to honor her need to leave work before the rush hour. While it is possible that Rush's failure to replace

16

the data manager caused Dr. Shott's workload to increase, and it is possible that the increase aggravated her disability to the extent that the data manager issue ultimately became an issue of accommodation (something not proven but perhaps inferable from the evidence), it would be impermissible to charge Rush with disability discrimination for a decision it made long before it had any notice that the decision had an impact on plaintiff's disability. Rush's responsibility, the law makes clear, began when plaintiff gave it notice that an accommodation was needed. *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir. 1997).

The court can find nothing in the record suggesting that Dr. Shott raised the need to replace the data manager as a possible accommodation until many months after the decision was made. In her July 22 letter, Dr. Shott both lambasts Dr. Preisler for not replacing the data manager and asserts for the first time that "repetitive computer work such as data entry" causes her pain and stiffness; however, while this letter contains recriminations about Dr. Preisler's failure to replace the data manager, the letter asks Dr. Preisler only to replace a data entry clerk, a request to which Dr. Preisler agreed. A letter of December 15, 1994 (PX 38) is the first time Dr. Shott explicitly links her disability with the failure to replace the data manager, but it is in the context of explaining why she will need additional time to complete a certain analysis and does not in any sense make clear that she wants an accommodation in the form of a new data manager. The court readily agrees that in the best of all possible worlds, a sensitive and responsive supervisor faced with such a memorandum might try to figure out how he could make it easier for an employee to do her job, but in the context of months of complaints and accusations by Dr. Shott against Dr. Preisler, it would be asking a lot for him to interpret what sounds like another

17

in a long series of complaints about his failure to replace the data manager as a request for an accommodation. Not until early 1995, well after the filing of this lawsuit, did Dr. Shott begin to explicitly talk about the failure to replace the data manager as a failure to accommodate, and by this time, Dr. Shott's letters cannot reasonably be viewed as an attempt at a good faith interactive process. They are angry, blaming letters, written in the context of reiterating claims already at issue in a lawsuit.

Dr. Shott also maintained that Dr. Preisler "dumped" computer work on her. She introduced evidence that the data analyses he assigned her had too many variables and that the editing he required of her was unnecessary. She introduced evidence that her successor, Dr. Li Ming Dong, worked with fewer variables and was not required to do the editing work that Dr. Preisler required of her. Dr. Shott repeatedly complained (although only after January 1995 and after her lawsuit was filed) that this work was excessively burdensome, given her arthritis, but the record is devoid of evidence that the variables and editing were in fact unnecessary to Dr. Preisler's research (Dr. Shott testified merely that she never saw this work cited in any of Dr. Preisler's publications) and, in fact, it was never made clear what these variables and editing were. However, because Rush did not attempt to demonstrate that the variables and editing were necessary to Dr. Preisler's research, plaintiff's evidence, as conclusory as it is, stands unrebutted and provides some support for a verdict in her favor. Moreover, plaintiff introduced evidence that when Dr. Li Ming Dong joined the Cancer Institute, the data clerks could not keep up with the data entry and that reducing the number of variables was a way of solving the problem. Tr. 870. But both because complaints of workload "dumping" preceded plaintiff's first notification to Dr. Preisler that her computer work created problems for her because of her disability and because

18

the court ended this trial with little if any understanding of what these variables and editing were, there was scant basis in this record for the trier of fact to conclude that it would have been a reasonable accommodation for Dr. Preisler to reduce the number of variables or limit the amount of editing of data he required.[5] Moreover, although Dr. Dong's testimony suggested that the number of variables could have been reduced, her testimony does not in any way suggest that the typing load which was so problematic for Dr. Shott could have been substantially minimized. Dr. Dong testified that she at times worked until 7, 9 or 10 in the evening, ten or eleven hours a day. Tr. 885, 892. She further testified that she spends approximately 8 hours a day at the computer typing, except when she attends meetings, and that the typing is "high volume typing." Tr. 894, 895. Thus, even if the variables could have been reduced and the need to edit output eliminated, the evidence still indicates that the biostatician job involved full days of keyboarding, something the record strongly suggests Dr. Shott could not perform, with or without accommodation.

Finally, there is the issue of Dr. Shott's removal from the Cancer Institute. The court has reviewed plaintiff's opening statement, plaintiff's closing argument and the jury instructions and can find no indication that there was any argument about the removal other than that it was an act of retaliation, a theory the jury rejected. *See, e.g.,* Tr. 1551. But the complaint charges that the removal was itself an act of disability discrimination. Reviewing the evidence in the light most

---

[5]Dr. Dong testified that the number of variable depends on the protocol, and that there were 50 to 100 variables in the protocol she was working on at the time of her deposition. This evidence certainly suggests the possibility that reducing the number of variables could have been an accommodation, but given the evidence that the number of variables depends upon the protocol, it is hardly clear that the variables could have been reduced in the protocol Dr. Shott was working on.

favorable to the plaintiff, it is possible that the jury could have viewed the removal as such.

The court disagrees with Rush's assertion that by rejecting plaintiff's retaliation claim concerning the removal, the jury necessarily found that Rush's stated reasons for removing Dr. Shott were not pretextual. The jury could well have found that Rush's stated reasons for removing plaintiff were unpersuasive but that nevertheless, in removing plaintiff, Rush did not act with retaliatory animus.

While the court believes that there is some evidence in the record that could support the jury's verdict on the disability claim, it concludes that Rush was prejudiced by the way this case was tried and is entitled to a new trial. Plaintiff's strategy was to throw at the jury approximately 18 months of alleged misconduct by Dr. Preisler and leave it to the jury to sort out his motivation. Under some circumstances this would be a reasonable strategy, but in this case, because Dr. Shott brought her need for an accommodation to Dr. Preisler's attention so late in the sequence of events, there is a substantial likelihood that the jury considered against Rush on the disability claim conduct that preceded any attempt at the good faith interactive process the law requires. For instance, plaintiff seeks to charge Rush with failing to accommodate her by replacing the data manager when the decision not to replace the data manager was made months before plaintiff first suggested that replacement of the data manager was necessary to accommodate her disability. Indeed, she did not make that suggestion until long after she had filed charges of disability discrimination against Rush and Dr. Preisler. She argued that the number of variables and the requirement that she edit output dis-accommodated her disability, while claiming that the "dumping" of computer work on her began in March 1994, again months before she brought to Rush's attention any need for an accommodation in terms of her computer

20

workload. She contends that Dr. Preisler failed to accommodate her disability by scheduling late meetings, but the record is devoid of evidence that this occurred more than a few times and is devoid of evidence that Dr. Preisler's suggestion, that on those few occasions she come late and leave late, was not an acceptable accommodation for her disability, even though if Fridays were involved (and it is not clear that Fridays were involved), it would have been an inadequate accommodation for her religious observance.

Thus, much of the conduct which plaintiff argued demonstrated defendant's failure to accommodate her arose long before she made any effort to communicate to defendant that she needed an accommodation. The possibility of jury confusion stemming from the chronology of the evidence was exacerbated by the court's refusal to give Rush's proposed instruction no. 23, which would have instructed the jury to focus its attention in considering the ADA claim on events occurring after May 27, 1994. The court rejected the instruction based on plaintiff's argument that her disability was obvious to everyone prior to that date. But reviewing all the evidence, it is clear that while her disability may have been obvious, her need for an accommodation was not obvious. Defendant was thus seriously prejudiced by the court's failure to give this instruction.

In addition, the evidence that plaintiff could have performed the typing duties of her job with reasonable accommodation was very weak, at best. The evidence indicated that plaintiff's successor spent long days engaged in heavy clerical typing. Plaintiff's contention that the number of variables could have been reduced was not supported by evidence that the number of variables could have been reduced sufficiently to reduce the amount of clerical typing sufficiently to permit plaintiff to perform the duties of the job. Similarly, plaintiff's complaint

that she should not have been required to provide actual computer output rather than a summary report was never actually proven. Plaintiff stated her opinion on this subject, but no evidence was presented which provided the court–let alone the jury–with a basis for evaluating her contention.

For all these reasons, the court concludes that the jury's verdict on plaintiff's disability claim was against the weight of the evidence. In addition, the manner in which plaintiff's various theories were presented to the jury was too confusing to provide any assurance that the jury was able to hold plaintiff to her appropriate burden on the disability claim, and the likelihood of prejudice to Rush was compounded by the court's failure to give an instruction, such as Rush's proposed instruction no. 23, which would have focused the jury's attention on the chronology critical to evaluating the failure to accommodate claim. Rush's motion for a new trial on the disability claim is therefore granted. Defendant's Post-Trial Motions are otherwise denied [128]. Plaintiff's Motion to Amend the Judgment [129-1] is denied as moot. Plaintiff's Fee Petition [129-2] is denied as moot.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED:        June 8, 2000